Howard KALINSKY, Plaintiff,

v.

LONG ISLAND LIGHTING
COMPANY, Defendant.

No. 79 C 3006.

United States District Court,
E. D. New York.

Feb. 11, 1980.

William F. Dudine, Jr., Darby & Darby, New York City, for plaintiff.

Edward M. Barrett, Richard A. Freedman, Mineola, N.Y., for defendant.

MEMORANDUM & ORDER

PLATT, District Judge.

This action involves plaintiff's motion for a preliminary injunction, and defendant's

motions for a preliminary injunction, for an order to dismiss, and for an order designating this case a "Long Island" case under the local rules and transferring the proceedings to Westbury. Plaintiff invokes jurisdiction under 28 U.S.C. §§ 1331 and 1343.

## FACTS

Some four years ago the Long Island Lighting Company ("Lilco") sold to, and installed in, the Howard Kalinsky household electrical space heating, allegedly representing to Mr. Kalinsky that electrical heating was the least expensive way to heat his home. About the same time (e. g., January 20, 1976) the Public Service Commission of the State of New York ("PSC") ordered Lilco to submit a rate proposal pricing electricity by time of use ("peak-load pricing") for residential customers consuming large quantities of electricity. According to defendant, on October 1, 1976 it notified by mail all those residential consumers that Lilco anticipated would be affected by use of peak-load pricing—including the Kalinsky family. After public hearings, an order was issued by the PSC on September 1, 1977 approving peak-load pricing[1] for residential customers whose consumption exceeded 45,000 kilowatt hours ("KWH") in a past twelve-month period. The Kalinsky household constituted such a customer. Lilco claims during the week of January 23, 1978 all customers consuming more than 45,000 KWH (including plaintiff) were notified they would be placed on peak-load pricing rates beginning in the fall of 1978.

After affirmation of rates based on peak-load pricing by the New York Court of Appeals in *Council of Retail Merchants v. PSC*, 45 N.Y.2d 661, 412 N.Y.S.2d 358, 384 N.E.2d 1282 (1978), Lilco mailed (on May 18, 1979) the affected consumers notice that their bills would soon reflect the new rate structure. Again, according to Lilco, Mr. Kalinsky was sent such notice. Mr. Kalinsky thereafter requested that his account be reviewed in order to confirm whether or not it qualified for inclusion in the new structure. Confirmation by Lilco that Mr. Kalinsky's account did so qualify was mailed on June 5, 1979; this letter further requested that plaintiff contact Lilco to schedule an appointment for installation of the necessary metering equipment—a request to which plaintiff failed to respond. During the summer of 1979 Lilco personnel attempted to install the new meter, but were denied entry to plaintiff's home. Another request, and another refusal, occurred on October 17 and October 23, 1979, respectively. The October 23 refusal was made by phone, and when Lilco sought to discuss the rate with plaintiff he refused to do even this.

Finally, plaintiff was notified his continued refusal to allow Lilco to install the new meter was a violation of PSC orders and would result in termination of electric service for failure to obey Lilco's tariff. Plaintiff again refused. On October 24, 1979, plaintiff was sent a final disconnect notice which gave five days written notice of Lilco's intention to disconnect plaintiff's service. Lilco so informed the PSC. Plaintiff then brought this action.

Plaintiff's complaint seeks (i) a declaratory judgment pursuant to 28 U.S.C. § 2201 declaring that plaintiff is not covered by, or is exempt from, the peak-load pricing rate structure and (ii) injunctive relief restraining defendant from disconnecting plaintiff's electrical service. The issues of law outlined in plaintiff's motion papers and defendant's papers in opposition are quite unique. In essence, plaintiff claims the constitutional rights of which he is being

---

1. At that time, according to Lilco, the new rate would vary from 2.1¢ per KWH 10PM to 10AM and all day Sundays between October and May, to 29.30¢ per KWH 10AM to 10PM June through September, except Sundays, and only when the outside temperature exceeds 83° F. during these periods.

 Under this rate, those affected would have bills approximately equal to what they would have been on the old rate. While some would have larger bills, those consumers taking advantage of off-peak rates would enjoy considerable savings. Since the original 1977 PSC order, the rates involved have increased somewhat; the 83° F. temperature threshold has been reduced to 81° F.

denied include deprivation of property without due process of law and invasion of his right to privacy. Plaintiff further asserts violations of his civil rights under 42 U.S.C. § 1983.

Defendant argues: (i) federal courts do not have jurisdiction over plaintiff's claim under the Johnson Act, 28 U.S.C. § 1342; (ii) the action should be dismissed for failure to state a claim upon which relief can ·be granted; (iii) the action should be dismissed for lack of a necessary party—the PSC; (iv) the action is improperly before this Court under the doctrine of primary administrative jurisdiction; (v) it does not satisfy jurisdictional requirements under 28 U.S.C. § 1331 that plaintiff anticipates defendant's answer may raise a federal question; and (vi) the action should be transferred to the Long Island Courthouse pursuant to local rule Chapter 4, Rule 1.

## DISCUSSION

### I

Defendant's contention that this Court does not have jurisdiction over plaintiff's claim under the Johnson Act, 28 U.S.C. § 1342, questions this Court's power to adjudicate plaintiff's claim. The Johnson Act, in full, provides:

> The District Courts shall not enjoin, suspend or restrain the operation of, or compliance with, any order affecting rates chargeable by a public utility and made by a State administrative agency or a rate-making body of a State political subdivision, where:
>
> (1) Jurisdiction is based solely on diversity of citizenship or repugnance of the order to the Federal Constitution; and,
>
> (2) The order does not interfere with interstate commerce; and,
>
> (3) The order has been made after reasonable notice and hearing; and,
>
> (4) A plain, speedy and efficient remedy may be had in the courts of such State.

Courts have interpreted this law to bar adjudication on the merits of claims that come within the statute. *General Invest-*

*ment & Service Corp. v. Wichita Water Co.,* 236 F.2d 464 (10th Cir. 1956); Cf. "Validity, Construction, and Application of the Johnson Act (28 U.S.C. § 1342), Prohibiting Interference By Federal District Courts with State Orders Affecting Rates Chargeable By Public Utilities," 28 A.L.R.Fed. 422, at 426–27 (1976). Moreover, it has been held that the prohibition of the Johnson Act may not be avoided by basing an action on civil rights statutes, including 42 U.S.C. § 1983. *Klotz v. Consolidated Edison,* 386 F.Supp. 577 (S.D.N.Y.1974); 28 A.L.R.Fed. 422, *supra,* at 435.

 Federal courts have also held that all four requisites must be satisfied for the Act's prohibition to apply. *Zucker v. Bell Tel. Co.,* 373 F.Supp. 748 (D.Pa.1974), *aff'd without op.* 3 Cir., 510 F.2d 971, *cert. denied,* 422 U.S. 1027, 95 S.Ct. 2621, 45 L.Ed.2d 684; *DeKalb County v. Southern Bell Tel. & Tel. Co.,* 358 F.Supp. 498 (S.D. Ga.1972), *aff'd,* 5 Cir., 478 F.2d 700. The first element, jurisdictional basis, is clearly satisfied, as the complaint alleges violations of the First and Fourteenth Amendments, as required by the statute invoked, 42 U.S.C. § 1983 and its jurisdictional counterpart, 28 U.S.C. § 1343. The second element, noninterference with interstate commerce, is also satisfied as the order in question here affects only electric rates in Nassau, Suffolk, and parts of Queens counties. "The rule is undisputed that a rate issued by a proper state body does not interfere with interstate commerce [within the meaning of 28 U.S.C. § 1342(2)] unless it is directly burdensome or otherwise discriminatory of the (sic) interstate traffic." *New York Central R. Co. v. Illinois Commerce Commission,* 77 F.Supp. 520, at 522 (N.D.Ill. 1948). Cf. *General Investment & Service Corp., supra,* and *Pudlik v. Public Service Co. of Colorado,* 166 F.Supp. 921 (D.Colo. 1958). No such burden, and no such discrimination is present here. The third criteria, that the order be made pursuant to reasonable notice and hearing is satisfied as all public notices and public hearings required by The New York Public Service Law were fulfilled. See *Tennyson v. Gas*

*Service Co.*, 506 F.2d 1135 (10th Cir. 1975). In the case at bar, plaintiff was mailed notice on October 1, 1976 of public hearings on peak-load pricing to be held on October 12, 1976. The hearings were held on that date in the PSC offices, Two World Trade Center, New York. Finally, the requirement that a "plain, speedy, and efficient remedy may be had" in the state courts is satisfied as plaintiff could bring a complaint before the PSC, and then appeal any PSC determination to New York's state courts. Cf. *Tennyson, supra; Klotz, supra.*

Thus, the four requisites set out in the Johnson Act are satisfied and this Court is prohibited from enjoining operation of the order if it is determined that plaintiff here is indeed challenging the rate itself. Plaintiff contends this is not the case, and that the case at bar is indistinguishable from *Memphis Light, Gas & Water Division v. Craft*, 436 U.S. 1, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978), which challenged the constitutionality of utility service termination procedures.

But plaintiff's argument omits consideration of his own complaint. Paragraph 11 of the complaint challenges both the new *rate* and its *applicability* to plaintiff. "Furthermore, the proposed time of day *rate discriminates* against Kalinsky in violation of his constitutional rights . . ." Thus, plaintiff's challenge is to the rate itself and the rates application to his household. In *Memphis Light, supra*, the rate itself was not being challenged. Rather, the issue in that case was whether continued utility service constituted a "property" interest within the meaning of the due process clause, and if so, what process was due before termination was permissible. In *Memphis Light* termination of service had occurred five times, here it has not occurred at all; in *Memphis Light* the customer was "never apprised of the availability of a procedure for discussing her dispute 'with management' ", 98 S.Ct. at 1562, here Lilco has repeatedly sought "discussions" with plaintiff. But most importantly for purposes of the Johnson Act, the *Memphis Light* case challenged *procedural* aspects of the utility's termination process, while the case at

bar challenges, as noted above, the rate and its application to plaintiff. This case is much more like *Tennyson v. Gas Service Co., supra*, where the 10th Circuit invoked the Johnson Act to bar plaintiffs' challenge to "late charge assessments" made by the utility against the class of customers who failed to pay their bills within a specified number of days. There, as here, the complaint challenged the rate itself.

For these reasons we hold plaintiff's claim is barred by the Johnson Act.

## II

[3] Even if we were to hold that plaintiff's claim was not barred by the Johnson Act, he still should be denied relief. Specifically, plaintiff's contention that the adverse financial impact of Lilco's peak-load pricing system can only be avoided by sacrificing plaintiff's constitutionally protected right of privacy is without merit. In essence, plaintiff argues the "drastic and unduly burdensome change of lifestyle" required to utilize electricity in the Kalinsky household during "off-peak" hours constitutes an impermissible intrusion on his right of privacy within the meaning of *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) and *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).

In *Griswold* the Court stated that "the First Amendment has a penumbra where privacy is protected from governmental intrusion" and held unconstitutional a Connecticut statute proscribing use of contraceptives by married couples. The Court said that the very idea of enforcement of the statute was "repulsive to the notions of privacy surrounding the *marriage relationship*." 381 U.S. at 486, 85 S.Ct. at 1682 (emphasis added). And the Court emphasized the special nature of the rights being protected: "Marriage is a coming together, for better or for worse, hopefully enduring, and intimate to the degree of being sacred." *Id.*

Mr. Kalinsky's situation is quite different. In *Griswold* the statute denied all

means of contraception—it left married couples with no alternative. Here, Mr. Kalinsky is given his choice of when to use the electric service Lilco provides. Lilco is not denying him all electric service whatsoever during peak hours, they are merely charging more for their product during that time. So plaintiff here does have an alternative to the "change of lifestyle" of which he complains, and the alternative affects nothing more than his pocketbook. If he had no alternative, he *might* then more forcefully argue the *Griswold* analogy.

We might add that while many Americans probably also rely on appliances such as washing machines, dryers, and dishwashers, it cannot be said that one's relationship to one's electric vacuum cleaner or electric air conditioner is as intimate or sacred as one's relationship to one's spouse. Thus, *Griswold* cannot be read as protecting any alleged right by a consumer of electricity to wash one's clothes or bake one's bread during "peak hours."

Similarly, *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), deals with distinguishable subject matter, to wit, the highly controversial issues surrounding abortion. *Roe* held that abortion laws that excepted from criminality only procedures to save a mother's life, without regard to the stage of her pregnancy, violated the Due Process Clause of the Fourteenth Amendment. Though *Roe* specifically recognizes the constitutionally protected right of privacy, that case is not so broad as to extend such a right to protect peak-time consumption of electricity. Again, plaintiff here is not being denied all alternatives as petitioners in *Roe* were, and the argument set forth above concerning *Griswold* and the lack of alternatives in that case, applies with equal force here. The *Roe* decision is confined to its facts and is clearly inapposite here in a complaint challenging the rates charged by a public utility.

### III

▮ Notwithstanding the previous discussion, yet another reason forces us to deny plaintiff's motion. Rule 19 of the Federal Rules of Civil Procedure ("FRCP") describes certain parties needed for a just adjudication. Such a party shall be joined in the action if:

"(1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest."

In this action, the Public Service Commission of the State of New York appears to be such a party. New York's Public Service Law § 66(12) (McKinney's 1955), as amended, provides, *inter alia*, that:

No change shall be made in any rate or charge, or in any form of contractor agreement or any rule or regulation relating to any rate, charge, or service, or in any general privilege or facility, which shall have been filed by a utility in compliance with an order of the commission, except after thirty days notice to the commission . . . . No utility shall charge, demand, collect or receive a greater or less or different compensation for any service rendered or to be rendered than the rates and charges specified in its schedule filed and in effect;

. . . .

Thus, defendant Lilco cannot exempt plaintiff from the peak-load pricing scheme unless the PSC modifies its mandate. Indeed, it was the PSC which approved, on September 1, 1977, the peak-load pricing rate schedule in the first place. Disposition of this action without the PSC would most certainly impair or impede the PSC's interest and would make Lilco subject to inconsistent obligations. Even if this suit were not barred by the Johnson Act, and even if plaintiff's privacy claim had merit, this action should not proceed until the PSC is joined as a party defendant.

We note that in an analogous situation, the federal Department of Energy ("DOE") is required to be a party when its orders are at issue. *Dyke v. Gulf Oil Corp.*, 601 F.2d 557 (Em.App.1979); Cf. *Associated General Contractors of America, Inc. v. Laborers Int'l Local 612*, 476 F.2d 1388 (Em.App. 1973). The PSC does not seem to be in any different position here.

### CONCLUSION

Because of our determinations above, the remaining issues become relatively insignificant or moot. We only note that insofar as the doctrine of primary administrative jurisdiction is concerned, we should not proceed here if an administrative remedy is still available (See 16 NYCRR, Part 11); *Amtec Petroleum Corporation v. General Oil Distributors, Inc.*, 1979 Energy Rep. (CCH) ¶ 9746. Finally, at oral argument defendant withdrew its request to denominate this a Long Island case under the local rules.

Plaintiff's motion for a preliminary injunction is denied; defendant's motion to dismiss is granted. If plaintiff does not allow Lilco personnel to install the proper metering equipment in his home within the next 30 days termination of his electric service by defendant is appropriate.

SO ORDERED.